**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-02402-CMA

**OHIO SPINE NETWORK, INC.,**

**Plaintiff,**

**v.**

**LANX, INC.,**

**Defendant.**

_____

**REPORTER'S PARTIAL TRANSCRIPT**
**(Jury Trial Day 4 - Testimony of R. Seigneur)**
_____

        Proceedings before the HONORABLE CHRISTINE M.
ARGUELLO, Judge, United States District Court, for the
District of Colorado, commencing at 10:29 a.m. on the 7th
day of June, 2012, Alfred A. Arraj United States
Courthouse, Denver, Colorado.


        A P P E A R A N C E S

**FOR THE PLAINTIFF:**
PAUL J. LOPACH and MICHAEL J. HOFMANN, Bryan Cave, HRO,
1700 Lincoln St., Suite 4100, Denver, CO 80203-4541

**FOR THE DEFENDANT:**
WILLIAM J. LEONE, Fulbright & Jaworski, LLP, 1200 17th
St., Suite 1000, Denver, CO 80202
JEFFREY SMITH, Smith Byers, LLC, 1877 Broadway, Suite 605,
Boulder, CO 80302

1                    **JUNE 7, 2012**

2          (Requested proceedings.)

3          THE COURT:  Defendants may call their next witness.

4          MR. LEONE:  Your Honor, the next witness for the

5    defense is Mr. Ron Seigneur.

6          COURTROOM DEPUTY:  Your attention, please.

7          Raise your right hand.

8                    **RONALD SEIGNEUR**

9    having been first duly sworn, testified as follows:

10          COURTROOM DEPUTY:  Please be seated.

11          Please state your name, and spell your first and

12    last names for the record.

13          THE WITNESS:  Ronald L. Seigneur, R-O-N-A-L-D. Last

14    name is spelled S-E-I-G-N-E-U-R.

15                    **DIRECT EXAMINATION**

16    **BY MR. LEONE:**

17    Q.   Good morning, Mr. Seigneur.

18    A.   Good morning.

19    Q.   Can you tell us what you do for a living.

20    A.   I am a certified public accountant and licensed by

21    the State of Colorado, and have been since 1980.  I have a

22    CPA firm that is located in Lakewood, Colorado.  We employ

23    about 20 people.  My practice focuses on a broad range of

24    services.  We do tax returns and financial statements.  I

25    also do a lot of expert witness testimony related to

1    economic damages, litigation matters like this that we are

2    here today for, business valuation and those types of

3    services.

4    Q.    What is the name of your firm?

5    A.    Seigneur Gustafson, LLP.

6    Q.    How long have you been in business?

7    A.    I have been a CPA since 1980.  I have had my own

8    practice since 1988.

9    Q.    What did you do before you had your own practice?

10   A.    I worked -- I grew up in the restaurant business.  I

11   have a degree in hotel restaurant management from Michigan

12   State University.  Grew up in a family restaurant

13   business.  Worked in that industry for a little bit.  Went

14   back to school, got a master's degree in accounting, came

15   to Denver, worked for --

16        THE COURT:  Slow down.  She has to take down

17   everything you say verbatim.

18        THE WITNESS:  Worked for a large accounting firm

19   called Arthur Anderson here in Denver for a few years.

20   Left that firm, worked in oil and gas for a few years.  I

21   worked for a law firm as a legal administrator for a few

22   years, then started my own practice in 1988, emphasizing

23   accounting and tax and litigation services.

24   Q.    (BY MR. LEONE)  You mentioned you have a master's

25   degree in accounting.

1    A.    Yes.

2    Q.    Where did you get that degree?

3    A.    University of Michigan.

4    Q.    Okay.  Do you have an undergraduate degree?

5    A.    I have a degree from Michigan State University.  It

6    is called a bachelor's of administration and hotel

7    restaurant and institutional management.

8    Q.    Okay.  Have you authored any textbooks in the field

9    of -- have you authored any textbooks?

10   A.    I have, yes.

11   Q.    And what is the subject of the textbook you have

12   authored?

13   A.    Two books.  I'm co-author of book called *Financial*

14   *Valuation Applications and Models*.  It is in its third

15   edition, published by John Wiley & Sons.  It's over 1,300

16   pages.  It deals with valuation, cost of capital discount

17   rates, ways to determine damages and valuation issues.

18        I am also co-author of a book called *Reasonable*

19   *Compensation Applications and Models* that focuses on how

20   you determine reasonable compensation for owners in

21   closely-held businesses.

22   Q.    And have you done any teaching?

23   A.    I do.  I teach a lot.  I am an adjunct faculty member

24   at the University of Denver College of Law.  I have been

25   for 20 years.  I teach a class called Applied Leadership

1    in Management Theory in the law school curriculum.  I also

2    do a lot of teaching for the State Bar Association, for

3    what is called the Colorado Society of CPAs, which is our

4    professional organization here in the state, and for the

5    American Institute of Certified Public Accountants, which

6    is our national professional organization for certified

7    public accountants.

8    Q.    Have you ever taught a course called Business

9    Divorce?

10   A.    Yes.

11   Q.    What is that course about?

12   A.    That is a course that I was the co-chair of a couple

13   of years ago, that we put together for the Colorado Bar

14   Association, called CLE of Colorado, continuing legal

15   education, which is where lawyers get their continuing

16   education credits, co-sponsored by CLE of Colorado and the

17   Colorado Society of CPAs that I am a member of.  It was a

18   one-day curriculum that we put together that focuses on

19   the issues involved when closely-held businesses or family

20   businesses are effectively getting divorced; when owners

21   don't get along and they're breaking up, so to speak, like

22   a marriage, and their disputes that arise in terms of why

23   the business failed, who wants to leave, how you share the

24   assets and the liabilities and those types of things.

25   Q.    You mentioned the closely-held family corporation.

1    For those of our jurors who may not have experience with

2    corporations, what is a closely-held corporation versus

3    another kind of corporation?

4    A.    In my business, we distinguish between public

5    companies that are actively traded on the stock market.

6    We go home every day and we hear that the Dow Jones

7    Industrial has gone up or down.  It is on the news.  Those

8    are publicly-traded companies, where there are

9    shareholders, there are large trading organizations that

10   trade the ownership interest in those companies, versus

11   the vast array of American business is what we call

12   closely held; it is not publicly held.  You don't have a

13   place where you can go buy and sell your ownership

14   interests.

15        So the businesses that we work in our CPA firm,

16   which we have about 600 business interests we actively

17   work with on a broad array of industries and professions,

18   are all closely held, where there is one or more owners

19   and they don't have a place where they can go buy more or

20   sell their interest.

21        And a lot of those, probably the majority are

22   family-owned business or have family attributes or maybe

23   have a father and mother that founded the business, maybe

24   there is other family members working in the business.

25   But they're closely held, in the context of being owned

1    within a family.

2    Q.   Do you have any expertise in the field of business

3    valuation?

4    A.   I do, yes.

5    Q.   Can you describe briefly what that is?

6    A.   Well, the book I co-authored is a treatise on

7    business valuation.  I do a lot of teaching in that field.

8    Next week I am teaching a national program on business

9    valuation for the AICPA in Atlanta on people looking to

10   emerge into that discipline.

11       But valuation is something I have done for many

12   years in a broad range of context; marital dissolution,

13   people buying selling business.  When people die,

14   oftentimes their business interest needs to be valued for

15   a state tax return.  So I have credentials that support me

16   in that effort.

17       I am accredited in business valuation, which is a

18   credential offered by the AICPA based on experience,

19   testing and continuing education.

20       I am an ASA, Accredited Senior Appraiser by the

21   American Society of Appraisers in business valuation.  The

22   significance of that designation is that I have at least

23   10,000 hours of the experience doing valuation work.  And,

24   lastly, I am credentialed by the National Association of

25   Certified Valuation Analysts.  I have what is called the

1    Certified Valuation Analyst credential from that

2    organization, as well.

3    Q.    Okay.  Do you have any expertise in the areas of

4    reviewing and/or computing lost profits damages in cases?

5    A.    Yes, I do.

6    Q.    And can you describe for us briefly what kinds of

7    experiences you have there?

8    A.    I have had a number of engagements over the last

9    20-plus years where the assignment is to determine lost

10   profits.  Sometimes it is lost wages.  Someone maybe has

11   been hurt in an accident and there is a claim they have

12   lost their wages, the context of the profits to an

13   individual versus a corporation or an entity that's lost

14   profits.

15        So we get engaged typically in a litigation

16   proceeding to determine lost profits in that context.  I'm

17   also a co-author of a book that is just being released, it

18   is called *Lost Profits*.  It is edited by Nancy Fannon.  I

19   have written a chapter in that book that focuses on lost

20   profits for restaurant entities, which is kind of a

21   particular focus of mine given my restaurant and

22   hospitality background.

23   Q.    Have you done any work in the medical field?

24   A.    I have.  We have some medical clients.  We have a

25   number of health care practitioners; doctors, dentists,

1    therapists, health care providers.  We do some orthopedic

2    clinics.  I have also been involved in valuation and

3    profits assessments with regard to medical equipment

4    companies through the years as part of my work as an

5    expert witness.

6    Q.    Any experience with distributors or commissioned

7    sales people and their earnings or damages?

8    A.    Absolutely.  Absolutely.  I have continuing clients,

9    tax clients that are manufacturers' reps.  They represent

10   a product line for a particular company where their

11   compensation is based on their sales, their ability to go

12   out and place the product with the end users or people

13   that sell the product to end users, and their compensation

14   is paid based upon a commission structure.

15        So it is not unusual in many types of industries in

16   businesses to employ folks that earn their compensation

17   based on their sales performance where they get some sort

18   of structured commission based upon their sales abilities.

19   Q.    Are there any professional standards, if you will,

20   that relate to the work that you do when you are looking

21   to lost profits calculations or damages?

22   A.    That is a great question.  As a licensed certified

23   public accountant, I have standards that I always need to

24   adhere to that are encompassed in all of the services I

25   do, whether it is a tax return or something like this

1      today, that requires me to be objective, maintain my

2      integrity, not celebrate my judgment to others, use

3      informed judgment, and just carry on objectively in a

4      manner that protects the public interest.

5            There are specific standards that we employ when we

6      do business valuations that are required by all CPAs in

7      the State of Colorado and most other licensing

8      jurisdictions; other states and places that license CPAs,

9      that if we do a valuation of a business for any purpose,

10     we have to follow specific standards, in terms of the

11     information that we need to use, the way we develop our

12     opinions, and the ways we report those opinions, and what

13     we might produce, either in a written or oral format.

14     Q.   I think the words I have heard is "we are supposed to

15     be ethically independent and neutral."  Would you agree

16     with that?

17     A.   Yes.

18     Q.   Okay.  What were you asked to do in this case,

19     Mr. Seigneur?

20     A.   There were two basic requests of me.  One was to

21     review a report that was rendered by Greg Taylor; his

22     report and his opinions.  And the second was to undertake

23     our own analysis of what we would compute as the lost

24     profits in this matter.

25     Q.   Okay.  And let me get right to the question.  In your

1    review of Mr. Taylor's work, do you agree with what he's

2    done in this case?

3    A.    No.

4    Q.    Going back to the question I asked you earlier about

5    professional standards, is it acceptable in your

6    profession for the damage expert to become an advocate for

7    liability?

8    A.    Absolutely not.

9    Q.    Let me start by asking you this question.  Are you

10   aware of any authoritative literature or available

11   literature that experts in your field look at to determine

12   what the average failure rate is for closely-held

13   businesses?

14   A.    Well, there are a number of statistics that are

15   widely available to the public.  One readily available

16   source is the Small Business Administration, which is a

17   U.S. federal agency that is -- their main purpose is to

18   support small businesses and foster small business.  They

19   do a lot of lending.  They guarantees loans that are made

20   through banks to small businesses, and they track a number

21   of statistics on the failure rate of closely-held

22   businesses; and partly because they guarantee those loans.

23         So when they make a loan through a bank that they

24   have a full or partial guarantee on and the business

25   subsequently fails, they, or the Government -- I guess we,

1    the taxpayers, end up taking on the burden of that loan

2    that has been made.

3           So they have a number of readily-available

4    statistics on business failures, as does the U.S.

5    Department of Commerce, another governmental agency that

6    tracks those types of statistics.

7    Q.   What is the failure rate for small businesses?

8    A.   It is a moving target.  One statistic I saw recently

9    from the Small Business Administration is that small

10   family-owned businesses, typically only 44 percent of

11   those businesses that are started make it past the fifth

12   year.

13          So, in other words, more than half of the

14   businesses that are started, small businesses, fail within

15   the first 5 years.  Another analysis that the Small

16   Business Administration did, where they took businesses

17   that were started in 1992 that they had made loans on, and

18   they tracked those businesses, in terms of the number of

19   businesses that were still operating, and 10 years from

20   1992, in 2002, only 29 percent of those businesses were

21   still in operation.

22   Q.   And in the course of your professional work, do you

23   work with small businesses?

24   A.   That's the core of our practice, yes.

25   Q.   How does your personal experience dealing with small

1  and family-owned businesses compare to what you see in the

2  government statistics?

3  A.   Unfortunately, it comes out in spades, particularly

4  in these tough times where, over the last few years, from

5  the fall of 2008, there has been a higher incidence of

6  failures just because of the turbulent times we have

7  suffered.  And we see that in our client base.  My

8  partners and I talk about that regularly; that we are

9  always actively looking for new clients and new business,

10  because we have an attrition rate in our client base

11  because our clients, unfortunately, go out of business for

12  a number of reasons.

13  Q.   Were you able to determine in this case whether Ohio

14  Spine Network, Mr. Lyon's business, would fall into that

15  category of small or family-owned businesses that you have

16  been describing?

17  A.   From everything that we saw, it is a closely-held

18  business.  It is not a publicly-traded business.  And the

19  ownership is limited to just a few people.  So, yes, it

20  would definitely fall in that category.

21  Q.   Okay.  Now, you have talked to us about the average

22  for small businesses.  In your review of Mr. Taylor's

23  work, were you able to determine whether he made any

24  assumptions about the likely continuation of the Ohio

25  Spine business in generating his damages' calculation?

1    A.    His calculations spelled out in his report use a

2    methodology that assumes the business and the income from

3    that business are going to continue into perpetuity; will

4    continue forever.  He does apply a discount rate to those

5    cash flows that are assumed to continue forever, that have

6    a very, very small component --

7    Q.    I will come back and break that down.  Let's take it

8    a piece at a time.

9         So one of the assumptions that you determined is

10   that he assumed that Ohio Spine would continue in

11   existence forever?

12   A.    Yes.

13   Q.    Were you able to see whether he had made any

14   assumptions about whether Ohio Spine would be profitable?

15   A.    Yes.

16   Q.    What was the assumption about whether or not Ohio

17   Spine would be profitable, and for what period of time?

18   A.    The analysis, which I believe is on his Schedule A,

19   shows that it has a certain level of profit that is taken

20   from the, what he calls the normalized 2010 activity, and

21   then he projects that profit to be growing, initially at

22   an increased rate, and then leveling off to where it grows

23   year after year at a constant 3-and-a-half percent per

24   year.

25   Q.    Now, so if I heard that right -- I apologize if I

1    missed something -- did you say that Mr. Taylor assumed

2    this company would be profitable year after year forever?

3    A.    Yes.

4    Q.    Did you say that he assumed that it would grow every

5    year forever?

6    A.    Yes.

7    Q.    In your review of Mr. Taylor's assumptions, is there

8    anything in his analysis that shows even the possibility

9    that they might have a bad year?

10   A.    No.

11   Q.    Or that revenues might go down in one year over the

12   prior year?

13   A.    Not directly.

14   Q.    Okay.  And let me have you take a look at a

15   demonstrative exhibit.

16          MR. LEONE:  Your Honor, this is -- this is a

17   demonstrative exhibit used yesterday by plaintiff's

18   counsel.  May I publish?

19          THE COURT:  Any objection?

20          MR. LOPACH:  No objection, Your Honor.

21          THE COURT:  You may.

22   Q.    (BY MR. LEONE)  Mr. Seigneur, I have put on the elmo

23   a summary of Mr. Taylor's lost profit calculation.  Can

24   you point out to the jury what numbers you are looking at

25   that show these assumptions that you've described of

1    perpetual growth and perpetual existence?

2    A.   Well, on my screen the numbers aren't as clear as I

3    would like them to be.  But in the analysis, Mr. Taylor

4    has used a -- what he calls a normalized number for the

5    historical income, the number you see under the column

6    2009, and then taken that number and adjusted it to what

7    he believes 2010 should be based on his calculations that

8    are on a sub-schedule.  But he effectively has 2010 being

9    a number that is a growth rate of 15 percent higher than

10    what the 2009 number would otherwise indicate.

11         There are some other adjustments in that number,

12    but the key point is that there is an assumed 15 percent

13    growth in net income from 2009 to 2010.  And then you can

14    see that number going forward under the columns 2011 and

15    2012 are growing, and they're growing at a percentage that

16    is in the footnotes of this schedule in the report, where

17    the growth rate from 2010 to 2011 is assumed to be 10

18    percent, as opposed to the 15 percent from 2009 to 2010.

19    And then 6 percent from 2011 to 2012.

20         So the number in 2012 is effectively 106 percent of

21    the number in 2011.  And then from 2013 forward,

22    Mr. Taylor assumes that that net income will grow every

23    year at a constant 3-and-a-half percent.

24    Q.   Now, on this demonstrative exhibit used yesterday,

25    the column stops at 2016.  How can you say that he also

1    puts money into this calculation for the assumption that

2    the business will continue forever?  Where is that?

3    A.   Well, you will see the last column, just to the right

4    of 2016 is labeled "Residual."  And that's a different

5    term.  We use "Terminal," the terminal value.  But you

6    will see 874,000 number that is equal to the same number

7    in 2016, has a number below it, $5,905,000.  That number

8    is the calculated number using the same approach that is

9    used in business valuation, where you capitalize that

10   number.

11        That is the term that we use in business valuation

12   science, to capitalize that continuing cash flow.  But the

13   way that that math works, that capitalization process

14   takes into account a 3-and-a-half percent constant

15   perpetual growth of that residual cash flow year in and

16   year out forever.

17        So in calculating that almost $6 million number, it

18   is assuming that that net income is growing at

19   3-and-a-half percent per year every year forever.

20   Q.   Let me see if I can break that down into simpler

21   concepts.

22   A.   Thank you.

23   Q.   What is the idea behind this residual or terminal

24   value?  Is there an idea behind it?

25   A.   The construct -- the process that we use to value a

1    business, which is essentially what Mr. Taylor is doing

2    here, is trying to come up with an overall enterprise

3    value of OSN, is the same approach that is used if someone

4    has their home appraised and a real estate appraiser comes

5    out and looks at your home and they try to value your

6    home, or a commercial property based upon what it would

7    rent for over a period of time.

8            What you do is you look at the assumed cash flows

9    from that asset.  And let's -- because I think it would be

10   helpful for the jury, if you have a piece of commercial

11   real estate, an apartment building, and you are trying to

12   figure out what it is worth, because the bank wants it

13   know that to make a loan on the building, so you hire an

14   appraiser, someone like me, but they appraise commercial

15   real estate as opposed to operating closely-held

16   businesses, that real estate appraiser is going to look at

17   the cash flows from that apartment building, and they are

18   going to assume that there are costs associated with that

19   apartment building operating it; repairs and maintenance,

20   insurance, those types of things.

21           But they're going to assume it is going to continue

22   to operate and pay those cash flows in to perpetuity.

23   What real estate appraisers do, just like Mr. Taylor has

24   done, is they assume a sale of the business in some point

25   in the future.

1       So Mr. Taylor has assumed that this business, for

2  purposes of making the calculation that we are talking

3  about here, Mr. Taylor is assuming that those cash flows,

4  that 874,000, would effectively be sold to somebody in

5  2016 or 2017.  He is saying, what would someone pay me to

6  get 874,000 a year going forward if they assume that that

7  874,000 is going to grow every year at 3-and-a-half

8  percent, what can I assume someone would pay me for those

9  cash flows.

10      And he assumed that in that residual period,

11  someone would pay $5,905,000 to have the expectation that

12  they are going to get 874,000 that year and 874,000 times

13  103.5 percent next year, and so on, into the future.

14  Q.   Maybe I'm confused.  Did you determine in this case,

15  where does Ohio Spine's money comes from?

16  A.   It comes from commissions from selling the products

17  that they represent.

18  Q.   From personal services of the people?

19  A.   From the salesmen and the commissioned salesmen that

20  go out and make sales calls, and on doctor offices, and

21  sell them medical equipment that the doctors use in their

22  surgical procedures.

23  Q.   Well, if the people aren't there, how does Ohio Spine

24  earn money?

25  A.   They don't.  The model of this company is that the

1    income is driven based on this commission-based model we

2    have talked about, where they have got to be out selling

3    products to earn the commissions to drive the cash flows

4    coming into the business, that then are subject to other

5    operating expenses; the costs of those salesmen and the

6    administrative costs of supervising and organizing the

7    salesmen, to create the opportunity to have this net

8    income going forward.

9    Q.    Okay.  Let me ask you this question.  I would like

10   you to assume for a minute that there is a 75 percent

11   chance that Mr. Lyon's work force and sales reps are so

12   unhappy with the situation at Ohio Spine that they were

13   all going to leave or all of the important ones are going

14   to leave.  Is there any place in Mr. Taylor's analysis

15   where he accounts for that probability?

16   A.    There is one small place where it appears he's

17   allowed for a small slice of probabilities like that and a

18   myriad of other things.

19   Q.    And I guess I will get down to that small slice in a

20   minute, but let's stick with the assumption here for a

21   minute that there is a 75 percent chance that they all

22   would have left anyway.  Is that accounted for in his

23   calculation?

24   A.    Not with respect to how I would approach that type of

25   scenario.

1    Q.    Supposing the jury were to find there was only a 50

2    percent chance that all of these sales reps would leave,

3    is that 50 percent probability accounted for in his

4    calculation?

5    A.    I don't see that, no.

6    Q.    How about only a 25 percent chance that these people

7    would have left anyway, is that accounted for in his

8    calculation?

9    A.    Not that I can see.

10   Q.    How about 10 percent; if there was just a 10 percent

11   chance -- one in 10 chance they would have left anyway,

12   regardless of anything Lanx did, is that accounted for in

13   the calculation?

14   A.    Now we are getting down to maybe the small slice I

15   mentioned that accounts for enough of that portion of a 10

16   percent likelihood of that occurring.  I don't think so,

17   but --

18   Q.    Okay.  Now we heard lots of testimony about a

19   discount rate.  Do you know what a discount rate is?

20   A.    Absolutely.

21   Q.    Have you worked with a discount rate before?

22   A.    That's the chapter I authored in my book, yes.

23   Q.    Were you able to determine whether or not Mr. Taylor

24   put anything into his 18 percent discount rate that would

25   account for at least some risk that these people would

1    have left anyway?

2    A.    Yes.

3    Q.    How much did he put into his discount rate for that

4    probability?

5    A.    The discount rate analysis that is included on a

6    schedule in his report uses a methodology called a

7    "build-up method" to come up with the overall rate, is

8    18.3 percent that you can see on this schedule.  It says

9    discount factor, 18.3 percent.

10         And in the development of that number, the 18.3

11   percent, Mr. Taylor has included a component of 3

12   percent -- 3 of the 18.3 percent, that he attributes to

13   what we call specific company risk.  It is also referred

14   to as unsystematic risk.

15   Q.    Let me ask you about this.  This 3 percent, if I

16   understand correctly, he applies -- he adds that to other

17   things to get to 18 percent?

18   A.    Yes.

19   Q.    Then he multiplies that times this

20   constantly-increasing revenue -- excuse me, this

21   constantly-increasing income?

22   A.    Yes.

23   Q.    And then he subtracts that from that

24   constantly-increasing income?

25   A.    Well, unfortunately it is not quite that simple.  He

1    applies that rate -- it is a concept called "discounting,"

2    and it is a very complex topic.  It deals with

3    present-time value of money.  It has to do with whether

4    you would rather have a dollar today or a dollar next

5    year.  And it is a very difficult -- I try to teach this

6    in class.  I try to articulate it in books I write.

7         But that 18 percent has to do with the time value

8    of money concept; to essentially take into account that

9    these dollars in future years that are laid out on the

10   schedule, are not as valuable as having those same dollars

11   today; that you have to discount those dollars because

12   they're dollars that are anticipated to be received in the

13   future.

14        You are anticipating to receive $760,000 in 2012,

15   and I would rather have 760,000 today versus 760,000 in

16   2012.  So that number I am expecting to get in 2012 is

17   worth less to me today, because I have to wait 2 years,

18   effectively, to get that money.

19        So the concept of discounting the 18.3 percent is

20   what takes into account the degradation of the value of

21   those future anticipated dollars that are laid out in this

22   schedule.

23   Q.   Let's go back to something maybe a little simpler.

24   You said he has a 3 percent number built into his discount

25   rate.  Do you think that is reasonable in light of any of

1    the other assumptions I gave you; that there is a 75

2    percent or 50 percent or 25 percent chance that these reps

3    would have left Ohio Spine anyway?

4    A.    I work with this particular aspect of discount rates

5    a lot and have testified about it a lot.  And I don't

6    think that the 3 percent is reasonable, because not only

7    does it have to take into account that the risk of the one

8    issue that you are talking about, in terms of the risk of

9    sales people leaving for whatever reason, but it has to

10   take into account all of the other business risks that

11   Ohio Spine have to take into account as a small

12   family-owned, closely-held business.

13   Q.    Okay.  Now, let's talk for just a minute about this

14   assumption you have identified in your analysis of

15   ever-increasing income.  Did you learn anything in the

16   course of performing your work that relates to whether or

17   not that is a reasonable assumption?

18   A.    The data that we were provided had information on the

19   performance of OSN for 2009 and 2010.  And we looked at

20   that information and tried to analyze that with respect to

21   the trends.  So we put a lot of emphasis on that part of

22   our analysis.

23   Q.    What did you find the trends were for actual income

24   and profits at Ohio Spine?

25   A.    Well, there were months that went up and months that

1    went down.  Not unusual, particularly with a start-up

2    business like this.  It's very difficult to use -- what we

3    have is historical performance here; 2009 and part of

4    2010, to try to project what is going to happen in the

5    future, because we have essentially got a start-up

6    business versus something that has maybe been around

7    operating for 10, 15, 20 years, where they have got a

8    track record, if you will.

9          But there were months that were up and months that

10   were down.  More down months than up months.  A lot of

11   variation in the monthly activity.  There were some issues

12   that Mr. Taylor pointed out that there were some sales

13   activities that took place in December of 2009 that didn't

14   get booked until January of 2010.  So when you look at the

15   monthly activity, it needed to be, what it calls

16   normalized, which is the same type of analysis we make.

17   But we put a lot of emphasis on looking at quarterly

18   trends.

19          And the three quarters that we thought were most

20   relevant were the third and fourth quarter of 2009 and the

21   first quarter of 2010, looking at that activity to try to

22   help us to understand the direction historically, based on

23   that small period that OSN was tracking.

24   Q.   What did you learn from looking at those quarters?

25   A.   The rough numbers for the third quarter of 2009, the

1    sales; a million 195, I believe.  And then fourth quarter

2    was, I think, a million 87; a drop of about 15 percent

3    from third quarter 2009 to fourth quarter 2009.  And then

4    the first quarter of 2010, the total sales where, I think,

5    963,000.  So about a 19 percent drop from the fourth

6    quarter of 2009 to the first quarter of 2010.

7         So, overall, a 34 percent drop from the second

8    quarter of -- third quarter, I am sorry, of 2009, to the

9    first quarter of 2010.

10   Q.    How did that actual drop that you were seeing in the

11   information compare to the assumptions that Mr. Taylor

12   made about this company going forward?

13   A.    Well, we read his report, and we understand that he

14   didn't -- he didn't appear to rely on that type of trend;

15   that actual information, in him coming up with his growth

16   estimates of 15 percent, 10 percent, 6 percent, and then

17   3-and-a-half percent forever.

18   Q.    Did you try to do something else, something

19   different?

20   A.    In our analysis, we used a different approach.

21   Q.    Did you think it was reasonable for Mr. Taylor to

22   assume that growth and profitability went on forever in

23   light of the actual information you have?

24   A.    No.  And, particularly, with only 3 percent that he

25   added to his risk rate, because they were in tandem.  So

1    together they didn't make sense to us at all.

2    Q.    Okay.  So how did -- first of all, in going forward

3    to try and come up with another way to do this, did you

4    make any assumptions about liability here?  Did you make

5    assumptions about whether or not the plaintiff could prove

6    his case?

7    A.    No.

8    Q.    Did you make any assumptions about -- what were you

9    trying to measure in your approach?

10   A.    Lost profits.

11   Q.    Lost profits from what?

12   A.    Lost profits from what we understand was an alleged

13   breach of the contract between Lanx and OSN for OSN to be

14   selling on a commission basis the products of Lanx in the

15   State of Ohio.

16   Q.    That is really the point I was after.  You say an

17   alleged breach of contract.  Are you expressing any

18   opinion today about whether there was or was not a breach

19   of contract?

20   A.    No, I can't do that.

21   Q.    Are you expressing any opinion about whether there

22   was or was not any improper interference with Ohio Spine

23   business?

24   A.    I am not.

25   Q.    To punctuate that point, in the business of

1    professional accountants and damage estimators, is it

2    appropriate to express an opinion on liability, or do you

3    just assume that for purposes of your work?

4    A.    We view that as a legal opinion.  That's for a jury

5    or a judge to decide; for lawyers to make the arguments

6    and for you all to decide those issues based upon the

7    instruction from the Court.  It is not under our purview.

8    Q.    Okay.  So with that preface, then, that you are not

9    saying, but you are assuming these allegations are true,

10   how did you go about trying to figure out what would the

11   damages be if there was, in fact, a breach of contract?

12   A.    Well, under -- lost profits generally is a concept of

13   if there is a lost profit that is alleged and sustained,

14   the measure is what is that lost profit that would make

15   the damaged party whole?  Not more than whole, not

16   unjustly enrich that party or not short them on profits

17   that they would have otherwise made, but for that alleged

18   breach, which is a legal opinion.

19        So our job is to measure those lost profits and try

20   to come up with a quantified number of an estimate of what

21   those lost profits are, which is what we've tried to do in

22   our analysis and report.

23   Q.    Okay.  So if it would help you, did you come up with

24   various scenarios?

25   A.    I did.

1          MR. LEONE:  If I may publish a demonstrative

2    exhibit.  This is Exhibit C from Mr. Taylor's report.  I

3    am sorry, Mr. Seigneur's report.

4          MR. LOPACH:  No objection, Your Honor.

5          THE COURT:  You may.

6    Q.   (BY MR. LEONE)  Mr. Seigneur, can you tell us what

7    this Exhibit C demonstrative exhibit is?  Can you tell us

8    what it is?

9    A.   We, as we studied the information that was provided

10   to us, including Mr. Taylor's report and the information

11   he relied on, the contract and the legal pleadings, we

12   developed a format that ended up using four different

13   scenarios, and this sheet shows scenarios two, three and

14   four.  Scenario one, that I suspect we'll get to, is where

15   we -- our conclusion is there was no loss, no lost profit.

16          Scenarios two, three and four build on each other.

17   So, in terms of explaining what this schedule is, this

18   Exhibit C as part of our overall opinion, the best way for

19   me to do that is walk you through scenario two and let you

20   understand how the numbers work, and then show you how

21   three and four build on scenario two.

22          So, with that in mind, if you see in the upper

23   third of the schedule, where it says scenario two, we have

24   three months' activity; July, August and September.  And

25   as articulated in our report, under the assumption that

1    Lanx had the right to terminate the relationship with OSN,

2    but OSN had the ability to earn the lost profit for three

3    months from the end of the second quarter of 2010, we've

4    tried to project out what we thought those sales would be,

5    154,671 in July; 146,937 in August; and 139,591 in

6    September.

7         Based on our analysis of this downward trend we saw

8    happening in OSN, based upon that quarterly analysis that

9    I just referenced in terms of the 15 percent drop and the

10   19 percent drop, where we assumed for sake of our analysis

11   that they were going to continue to be on kind of a

12   downhill slide at 5 percent per month; that their sales

13   were slipping and heading downhill.

14   Q.   Let me break that down a little bit so it is clear

15   what we did here.  In this scenario two, I think you said

16   you have assumed for purposes of scenario two that things

17   kept going at Ohio Spine as they had been going in the

18   past; things were getting worse?

19   A.   Right.

20   Q.   And you've only included 3 months of damages here.

21   And is that to reflect an assumption that we're going to

22   assume that Lanx had the right to terminate, but that

23   there was a cure period or something, they had to wait 90

24   days to terminate?

25   A.   They had 90 days to cure.  And we assumed that 90

1   days is interpreted as a 30-day month, or 3 months for the

2   cure period.  So 3 additional months of activity.

3   Q.   Now, whether or not there is anything specific in

4   this contract that says differently, why do you make the

5   assumption when something says wait for 90 days, it means

6   wait for 90 days rather than 90 business days?

7   A.   Just based on my experience, 30 years as a CPA

8   looking at lots of contracts that have provisions that say

9   you have got 90 days to do something or 30 days to do

10  something, and we -- I have always assumed that assumes a

11  30-day month, notwithstanding that some months are a day

12  longer, one month is a couple day shorter.

13  Q.   Okay.  So if you assume -- you make the assumptions

14  we previously talked about, continuation of what had been

15  happening, what does that $60, 000 number then represent?

16  A.   We looked at historical trends, as articulated on

17  another schedule in our report, and we saw that their

18  average commission rate, the commission that they were

19  earning on the sales of product was averaging 34.4

20  percent.  So we just used that as a constant through our

21  analysis, and said they are going to earn commission on

22  those sales of 34.4 percent.

23       But, then, just like Mr. Taylor using a 42.9

24  percent, I think he called it a "contribution margin," I

25  call it a "profit contribution margin," I used 40 percent

1    as a constant to say the actual lost profit or the actual

2    net income at the end of the day to OSN from losing the

3    ability to sell product for 3 months is the numbers that

4    are articulated on the line "lost profits;" that the sum

5    total of those three numbers is the 60,674 that you have

6    circled.

7    Q.    Okay.  Let me ask you a really short question then.

8    Given the assumption that things would continue on, and

9    that they would get 90 days' notice before termination, is

10   that $60,000, is that the number you would award?

11   A.    Yes.

12   Q.    Okay.  And just one quick question that reminded me

13   something about Mr. Taylor's report.  You show a "profit

14   contribution margin" there?

15   A.    Yes.

16   Q.    Is that some sort of an estimate of the difference

17   between the expenses of the business and the commissions

18   that are coming in, roughly?

19   A.    The operating expenses of the business.

20   Q.    All right.  And it looks like you have assumed that

21   that profit margin stays the same for 3 months?

22   A.    I have.

23   Q.    Now, in Mr. Taylor's analysis, when you were looking

24   at that, did he make any assumption about whether that

25   profit margin would stay the same?

1   A.   He assumed it would stay constant; 42.9 percent

2   forever, effectively.

3   Q.   Forever?

4   A.   Forever.

5   Q.   Anything in his analysis to account for increase in

6   gas prices?

7   A.   No.

8   Q.   For increase in food prices?

9   A.   No.

10   Q.   For increase in anything?

11   A.   No.

12   Q.   Okay.  Scenario three.  Can you explain to the jury

13   briefly what the difference is, then, between scenario two

14   and scenario three?  Why does scenario three go out

15   farther?

16   A.   The best thing is to make note the first 3 months is

17   simply a reiteration of what you see in scenario two.  And

18   then I have tagged onto that the additional months of

19   October, November and December, using the same construct,

20   the same approach, the same profit margin, the same

21   commission rate and the same declining projection of sales

22   to come up with a total for 6 months of activity under the

23   assumption that the point that the contract could be

24   terminated -- again, a legal opinion to be made -- was at

25   the end of the calendar year.

1          So that they would continue to sell product through

2     the end of the calendar year and have 6 months, as opposed

3     to the 90-day cure period.  So we essentially just

4     extended the calculation of the lost profits for an

5     additional 3 months.

6     Q.    Okay.  So this would assume, then, that Lanx could

7     terminate the agreement but not until the end of 2010?

8     A.    Yes.

9     Q.    Okay.  And the number 91,423, what does that

10    represent, then?

11    A.    That represents the lost profit that we have

12    calculated based upon that scenario three, where the

13    difference is that the termination would be at the end of

14    the year as opposed to at the end of the third quarter of

15    2010 after a 90-day cure period we assume for those 3

16    months.

17    Q.    So that would be the number you would award if you

18    assumed that Lanx waited to terminate this company until

19    the end of the year?

20    A.    Yes.

21    Q.    Okay.  And, again, do you make the same assumptions

22    in scenario three that you made in scenario two; that is

23    that sales would have continued to decline at Ohio Spine

24    during 2010?

25    A.    Yes.

1   Q.   Okay.  And did you try to break out, you know, what

2   the effect on Ohio Spine's sales might have been if --

3   well, let me get at it this way.  In the first two

4   quarters of 2010 that you looked at, do you know whether

5   or not Ohio Spine had in place a number of experienced

6   sales reps?

7   A.   I know that in the second quarter of 2010 there were

8   transition issues with sales reps that were leaving.

9   Q.   Okay.  Well, let's go to the first quarter, then,

10  first quarter of 2010.  Did you have any assumption or

11  understanding as to whether Ohio Spine had in place a

12  number of experienced sales reps?

13  A.   Yes.

14  Q.   Okay.  And so the revenue that you are projecting

15  here includes the revenue from that period of time; right?

16  A.   Yes.

17  Q.   Okay.  And did you -- did you deduct anything for

18  your 2010 estimates here in scenarios two and three?  Did

19  you deduct anything for the possibility that Mr. Lyon's

20  sales reps would have left regardless of anything that

21  Lanx did?

22  A.   No.

23  Q.   Okay.  So you gave Mr. Lyon the benefit of the doubt

24  that the sales reps would have stayed with him and kept

25  performing at the same level?

1          MR. LOPACH:   Objection, leading, Your Honor.

2          THE COURT:   Sustained.

3   Q.   (BY MR. LEONE)  Did you make any assumption in favor

4   of Mr. Lyon about the continued performance of those sales

5   reps?

6   A.   We did in conjunction with what -- another schedule

7   of my report tries to capture, which is the sales activity

8   of an organization, which we understand took in most, if

9   not all of those sales reps during the 2010 period that is

10  at issue.

11  Q.   Okay.  We'll get to that in a minute.  But for

12  purposes of this, that is a separate analysis?

13  A.   That is a separate analysis.

14  Q.   Okay.  Lets go to scenario four, then.  Can you tell

15  the jury what is the difference between scenario four and

16  the first two scenarios?

17  A.   You will see, building on what we just walked through

18  from scenario two to scenario three, that scenario four

19  has the 6 months that is in scenario three, then we added

20  on an additional 3 months of projected sales and lost

21  profit calculation for January, February and March of

22  2011, under an assumption that Lanx, under the contract,

23  would have been required to give notice annually at the

24  end of the year, and that OSN would have had the 90-day

25  cure process or 90-day cure right at that point to have

1   another 3 months of sales activity accounted for.

2   Q.   So is that another way of saying that this assumes

3   that Ohio Spine had remained in business until March of

4   2011?

5   A.   Yes.

6   Q.   Selling at the same rate or in the same trend as they

7   had been selling before?

8   A.   Yes.

9   Q.   Okay.  And that number, then, is that what is

10  reflected by the 136-?

11  A.   Yes.

12  Q.   Okay.  Now, you mentioned earlier that you did

13  another analysis that looked at the activities of the

14  sales reps after they went to a different company?

15  A.   Yes.

16  Q.   And let me --

17       MR. LEONE:  Your Honor, I request to publish

18  demonstrative Exhibit B from Mr. Seigneur's report.

19       THE COURT:  Any objection?

20       MR. LOPACH:  No objection, Your Honor.

21       THE COURT:  You may.

22  Q.   (BY MR. LEONE)  Okay.  It looks like we have more

23  scenarios here.  Can you explain to the jury what you were

24  doing here?  What were you trying to analyze here?

25  A.   The difference in this Exhibit B from the one we were

1   just looking at is articulated in the third line in the

2   upper left corner, where it says "Damages based on OSS

3   actual sales."

4   Q.   Okay.

5   A.   What we have done is used as a proxy for OSN sales

6   activity, the monthly sales activity that was provided to

7   us by OSS for the sales that we understand of those same

8   products.

9   Q.   Okay.  Let me use a word other than "proxy" to make

10  sure we are communicating here.

11  A.   Okay.

12  Q.   In the first exhibit we looked at, you said you

13  assumed that Ohio Spine kept going the way it had been?

14  A.   Yes.

15  Q.   In this one, what are you assuming about what OSN

16  would have done in the period shown?

17  A.   We are assuming that OSN would have, in terms of as a

18  measure of the lost profit, would have had the benefit of

19  the sales that was made by OSS during the same months.

20  And the reason why we did this was because when we

21  determined that OSN was on a downward trend, we talked

22  about the three quarters and the 19 percent drop, 15

23  percent drop and the 19 percent drop.

24          And then in the Exhibit C, assumed a continuing 5

25  percent drop.  Well, we're taking that from the point of

1   the end of the second quarter of 2010, where we know, or

2   where we understand that there was a lot of things

3   potentially happening in that second quarter that made it

4   potentially unreliable as good data to work on, to build

5   ongoing forward.

6        So, to have a second perspective, if you will, to

7   look at how we can capture or measure the lost profits, my

8   staff and I talked, and we said we have got the data from

9   this other company and what they're selling, let's drop it

10  in and assume that that is the potential that OSN would

11  have had if those people that were selling that product

12  would have been under their roof instead of under the OSS

13  roof.

14  Q.   Okay.  And if you can, maybe in a little more summary

15  fashion, as we have talked about a lot of the assumptions,

16  can you just walk the jury through and point out to them

17  each of the numbers and why you have three different

18  numbers here?  I will circle them to draw your attention

19  to them.  What do those numbers represent?

20  A.   You will see we have scenarios two, three and four,

21  same time period, same months, using the same commission

22  rate; 34.4 percent, the same contribution margin, the

23  constant 40 percent.  And we have assumed 40 percent could

24  be constant, because we're only dealing with less than a

25  year.  There is 9 months in the scenario four.

1          If you take it out longer, you have to look at

2    increased gas prices, all of that.  All of those are

3    constant.  The only difference in calculating the three

4    numbers you have circled is the sales numbers are coming

5    from OSS sales versus the declining projection of OSN

6    sales.

7    Q.   Just so we are on the same page, when you say OSS,

8    you are referring to the new distributor that took OSN's

9    place?

10   A.   Ohio Surgical Solutions, I believe, is the name of

11   the company.

12   Q.   And did you have any assumptions or understanding

13   about whether that new distributor, Ohio Surgical, was

14   comprised of many of the same people that had been working

15   for OSN?

16   A.   That was our understanding, yes.

17   Q.   So these numbers, then, if I am understanding your

18   testimony correctly, would reflect how much money OSN

19   would have made if it had kept those people working and

20   they had made the same sales for OSN that they made for

21   OSS?

22   A.   Yes.  Our understanding is those people were covering

23   the State of Ohio, calling on essentially the same

24   customers, selling the same product.

25   Q.   Okay.  So, let me just -- I don't know if I can get

1    them all on here together.  Maybe I can.  So I have got a

2    lot of numbers here, and it is hard, sometimes, I think,

3    to track them.  Could you just very briefly, for the

4    jury's benefit, given the chance to take a note if they

5    want to, can you just kind of walk us -- not explain it.

6    I don't need you to replay everything you testified to.

7    Can you just highlight those six numbers, sort of from the

8    lowest to highest, and tell us if you have an opinion

9    which is most reasonable -- do you have a summary exhibit

10   that does that?  You do.  Let me put a different

11   demonstrative in front of you.

12        MR. LEONE:  Your Honor, I move to publish Exhibit A

13   demonstrative from Mr. Seigneur's report.

14        MR. LOPACH:  No objection, Your Honor.

15        THE COURT:  You may.

16   Q.   (BY MR. LEONE)  Can you tell us what Exhibit A is?

17   A.   This is a recap of the scenarios.  And I have rounded

18   the numbers here, the same numbers that were circled on

19   the two schedules you just looked at rounded to the

20   nearest thousands.  And the range is from zero, on

21   scenario one, where we are saying there was no cure period

22   and that the contract would be terminated, to the two,

23   three and four scenarios we just walked through, that

24   range from a low of 61,000 to a high of 370,000.

25        So our overall opinion is that the range of damages

1    that you see on the bottom line is somewhere between zero

2    and 370,000, based upon looking at the data two different

3    ways based on a number of different legal conclusions on

4    when the contract could be rightfully terminated.

5    Q.   Okay.  Based on your professional experience, do you

6    believe Mr. Taylor's approach to these damages of $5

7    million plus was a reasonable approach?

8    A.   No.

9         MR. LEONE:  Thank you.

10        No further questions, Your Honor.

11        THE COURT:  All right.  Very good.  Why don't we

12   all stand up and kind of stretch.

13        Mr. Lopach, will you be doing the examination?

14        MR. LOPACH:  I will.

15        THE COURT:  Mr. Lopach, you may proceed.

16                    **CROSS-EXAMINATION**

17   **BY MR. LOPACH:**

18   Q.   Good morning.  I believe you testified your role in

19   this case was to review and critique Mr. Taylor's expert

20   opinions; correct?

21   A.   Yes.

22   Q.   I think you said you were not asked to determine

23   who's right and who is wrong; is that right?

24   A.   Yes.

25   Q.   In fact, that is the jury's job in this case;

1    correct?

2    A.    Yes.

3    Q.    You also said that you cannot be an advocate; right?

4    A.    Yes.

5    Q.    I believe you said that under the ethical standards

6    of your profession, it would be improper if you were an

7    advocate in this process; is that right?

8    A.    Well, just to clarify.  We can be an advocate for our

9    number and our opinion, as opposed to being an advocate

10   for the client.

11   Q.    And you adhere to those principles in your analysis

12   here?

13   A.    I believe I do.

14   Q.    You also agree that the jury will decide whether the

15   contract in this case was terminated properly; correct?

16   A.    That is my understanding, yes.

17   Q.    And the jury will decide whether or not Lanx

18   unlawfully interfered with the business relationships

19   between the plaintiff and the defendant?

20   A.    That is my understanding, yes.

21   Q.    There was a statement in your report where you said,

22   I think you were commenting on Mr. Taylor's analysis,

23   where you said there is no explanation on how sales in the

24   last 6 months of the year -- I believe he was referring to

25   Ohio Spine sales -- would be substantially higher than the

```
 1    beginning of the year, thus allowing Ohio Spine to achieve

 2    the sales quota.  And that was your criticism; correct?

 3    A.    That is what I stated in the report, yes.

 4    Q.    It was your assumption, wasn't it, that Ohio Spine

 5    could not accomplish that goal; correct?  That over the

 6    second half of 2010, it would not sell enough product to

 7    reach the distributor performance quota within the

 8    parties' agreement?

 9    A.    Did not appear so, yes.

10    Q.    That is a jury issue that the jury will decide in

11    this case; correct?

12    A.    That's correct.

13    Q.    You made some comments on direct exam about "sales

14    forces."  Do you recall questions about the importance of

15    a sales force for a distributorship?

16    A.    Yes.

17    Q.    You would agree that in order to successfully sell

18    products for a distributor, it needs sales

19    representatives; correct?

20    A.    That is a fair assumption, yes.

21    Q.    You would agree, wouldn't you, that if a

22    distributorship has its sales force taken away from it,

23    that would certainly impede or completely prohibit its

24    ability to sell?

25    A.    If you assume that it is not replaced; correct.
```

```
 1    Q.    Correct.  Even during that process, it would impede

 2    sales; correct, if you had a period during which you had

 3    to replace sales people?

 4    A.    Yes.

 5    Q.    In your report you ran through a series of scenarios;

 6    correct?

 7    A.    Yes.

 8    Q.    And those scenarios reflected your analysis of lost

 9    profits?

10    A.    Yes.

11    Q.    And that were suffered by Ohio Spine; correct?

12    A.    Yes.

13    Q.    And the first scenario, as I understand it, you

14    assumed that the termination of the contract was proper;

15    correct?

16    A.    Yes.

17    Q.    Okay.  You also assumed that Ohio Spine was not given

18    any cure period; right?

19    A.    Yes.

20    Q.    So that seems pretty easy.  Lanx was right, they

21    could terminate the contract, and Ohio Spine gets no time

22    to cure any alleged breach; right?

23    A.    Correct.

24    Q.    So, in that scenario, you make no assumptions that

25    favor Ohio Spine; isn't that right?
```

1   A.   Well, my assumption is that they were terminated the

2   end of the second quarter.  They got the benefit of

3   operations through that period of time.

4   Q.   And that is Lanx's position in this case; correct?

5   Termination was proper, and that there was no cure period?

6   A.   I believe that's correct.  I haven't heard the

7   arguments.

8   Q.   In that scenario, your client wins and there is no

9   damages; right?

10  A.   Based on that scenario, yes.

11  Q.   But, as you said, you don't have any opinion as to

12  whether or not that scenario is proper; correct?

13  A.   I am not rendering an opinion on when the proper

14  termination is effective for the contract.

15  Q.   Let's talk about your second scenario.  Your second

16  scenario involves a situation where, again, you assume

17  Lanx's termination of the contract is proper; correct?

18  A.   Yes.

19  Q.   Okay.  And then you say -- but in this scenario, we

20  are going to have a 90-day cure period; is that right?

21  A.   Yes.

22  Q.   You had a file on this case; right?

23  A.   Yes.

24  Q.   You were provided materials by Lanx?

25  A.   Yes.

```
 1    Q.   Did those materials include the distribution

 2    agreement?

 3    A.   Yes.

 4    Q.   You read that agreement?

 5    A.   I did.

 6    Q.   Did you see in Section 11.2(a) that there is a cure

 7    period?

 8    A.   I recall that, yes.

 9    Q.   And the cure period states that upon written notice

10    of a breach, that Ohio Spine has 90 days to cure that

11    breach; correct?

12    A.   That is my recollection.

13    Q.   And there is another provision in the contract that

14    defines days; correct?

15    A.   Yes.

16    Q.   You weren't aware of that provision until very

17    recently, were you?

18    A.   I noted it.  It was business days as defined.

19    Q.   And you noted that, but then you didn't calculate

20    your 90 days as 90 business days in your report, did you?

21    A.   I had used my experience to say 90 days is 90 days.

22    That a business day isn't necessarily Monday through

23    Friday for a business like this.

24    Q.   So you substituted your interpretation of business

25    days for what is stated in the contract?
```

1    A.    I don't recall if it was stated as Monday through

2    Friday.

3    Q.    It says "business days," as defined in the State of

4    Colorado; correct?

5    A.    What is that?

6    Q.    Business days, as that is defined in the State of

7    Colorado?

8    A.    I don't know what the -- what you would be referring

9    to.

10   Q.    And under the contract, 90 business days, if you

11   calculate business days as Monday through Friday, you

12   don't include weekends, you don't include holidays; that

13   is the 4th of July or Labor Day, that would actually

14   translate into 130 calendar days; correct?

15   A.    That would probably be about right.

16   Q.    If we have a valid termination in this case on July

17   2nd, and we added 130 calendar days, that would actually

18   take us out to early November; isn't that right?

19   A.    That math sounds about right.

20   Q.    So instead of having 3 months, we are going to have

21   about 4-and-a-third months; correct?

22   A.    That would be about right, yes.

23   Q.    Now, in your scenario two, after you assume that the

24   termination is proper and that Ohio Spine gets a 90-day

25   cure period, your assumption is that Ohio Spine is unable

1    to cure over those 90 days, which I think we have a

2    difference of opinion as to whether 90 days or 130 days,

3    but your assumption is there is no cure; is that correct?

4    A.    That's correct.

5    Q.    And in that scenario, Ohio Spine is not allowed to

6    continue its business after the expiration of the cure

7    period; correct?

8    A.    I think they're okay -- they're not allowed to

9    continue with the contract, but they have their own

10   business.

11   Q.    So they are not selling Lanx product any more?

12   A.    Yes.

13   Q.    That is your assumption?

14   A.    Yes.

15   Q.    And in none of your scenarios do you ever assume that

16   Ohio Spine can cure; correct?

17   A.    That's correct.

18   Q.    If you assume that they could cure, wouldn't you

19   think that would be a beneficial assumption to Ohio Spine?

20   A.    Sure.

21   Q.    Okay.  Continually assuming that Ohio Spine could

22   never cure this breach, those assumptions all favor Lanx,

23   don't they?

24   A.    Well, it means that the contract says they can

25   terminate the contract.  I guess that favors Lanx.  I am

1   sure Lanx would rather have, you know, the distributors

2   out there that meet and exceed their sales quota.

3   Q.   That wasn't my question.   My question was, would the

4   termination of the contract, as you understand the facts

5   in this case, is that something Lanx wanted to accomplish?

6   A.   I don't know.

7   Q.   In your third scenario, you assume that the contract

8   is extended out to the end of 2010; correct?

9   A.   Yes.

10   Q.   And you assumed in this scenario that there is no

11   cure period; correct?

12   A.   That's correct.

13   Q.   So you ignored Section 11.2(a) within the contract

14   that allows for 90 business days or 130 days, for Ohio

15   Spine to try to cure any deficiencies; right?

16   A.   That's correct.

17   Q.   And that the contract would be terminated at that

18   point in time by Lanx.   You assume termination is correct

19   after December 31, 2010?

20   A.   That is what the scenario conveys.

21   Q.   In this scenario, assuming -- let's assume that

22   the -- that Lanx is correct, that it gave proper notice,

23   that it waited 6 months, it had the right to terminate the

24   contract.   You do not make any assumption that Lanx would

25   forebear, or even though it had the right to terminate the

1    contract, that it would decide not to exercise that right.

2    That is not one of your assumptions, is it?

3    A.    No.

4    Q.    That even though maybe this distributor wasn't

5    performing as well as Lanx would have wanted, that it

6    would just decide, well, I could terminate, but I am not

7    going to exercise that right.  You didn't make that

8    assumption, did you?

9    A.    I did not.

10   Q.    That is sort of the assumption that would benefit

11   Ohio Spine, wouldn't it, if it wanted to continue its

12   business with Lanx?

13   A.    I guess it would, yes.

14   Q.    It would allow it to stay in business, wouldn't it,

15   with Lanx?

16   A.    As long as it could continue to make sales that were

17   acceptable.

18   Q.    Your fourth scenario, you assume that Ohio Spine gets

19   to the end of 2010, and then Lanx decides to terminate the

20   contract, but it gives Ohio Spine a cure period; correct?

21   A.    Yes.

22   Q.    And, again, your report cites to 90 days, but if it

23   is business days, as we previously discussed, that cure

24   period would actually be 40 calendar days longer; right?

25   A.    I haven't calculated it.  The 130 days, that is

1    probably right.  A good estimate.

2    Q.    Under this scenario, in scenario four, you used Ohio

3    Surgical Solutions' numbers as a proxy; correct?

4    A.    Yes.

5    Q.    And under that calculation, you would say if we

6    allowed Ohio Spine to run its business through the end of

7    2010, and give it an additional 90 days, you calculated

8    that amount that the company would earn during that point

9    in time as $370,000; correct?

10   A.    That's correct.

11   Q.    Okay.  And that is over 9 months?

12   A.    Yes.

13   Q.    If you annualize that number, what would it be?

14   A.    I don't know.

15   Q.    About $41,000 a month, roughly, would you agree.

16   370,000 divided by 9?

17   A.    That sounds about right.

18   Q.    41,000 times 12, something shy of 500,000?

19   A.    That would be about right, yes.

20   Q.    In none of your scenarios do you assume that the

21   parties would continue on; correct?  That Lanx and Ohio

22   Spine would stay under this contract, Ohio Spine is the

23   distributor, Lanx provides medical products, and they

24   continue this distribution relationship down the road.

25   That is not an assumption that appears anywhere in your

1    report, does it?

2    A.    That's correct.

3    Q.    And if we use your annualized figure, even based on

4    OSS's numbers, which I believe my client thinks he could

5    have done much better, even if we use --

6         MR. LEONE:  Objection, Your Honor.

7         THE COURT:  Sustained.

8    Q.    (BY MR. LOPACH)  Even if we use the $500,000

9    annualized number, if we assume -- if we assume the

10   business relationship continues 10 years down the road, if

11   we took 500,000 times 10, what is that figure?

12   A.    Well, that is a hypothetical, assuming it is going to

13   beat the odds, ten times 500,000, it is 5 million.

14   Q.    $5 million?

15   A.    Yes.

16        MR. LOPACH:  If I may have a minute, Your Honor.

17        THE COURT:  You may.

18        MR. LOPACH:  I have no further questions, Your

19   Honor.

20        THE COURT:  All right.  Redirect?

21                   **REDIRECT EXAMINATION**

22   **BY MR. LEONE:**

23   Q.    Mr. Seigneur, just two quick questions.  One is this.

24   In the course of doing your analysis for the scenario

25   where you combine the sales of OSN for the first part of

1   the year with those of OSS for the second part of the

2   year, if you combine all of the sales of these reps,

3   whether they were working for OSN and for OSS, can you

4   tell from your report what the total sales of this group

5   was for 2010?

6   A.   I don't recall that number off hand.

7   Q.   Would it help you to look at your demonstrative

8   exhibit we had?

9   A.   I can do that.

10         MR. LEONE:   If I could, Your Honor, publish

11   Demonstrative B.

12         THE COURT:   Any objection?

13         MR. LOPACH:   No objection, Your Honor.

14         THE COURT:   You may.

15   Q.   (BY MR. LEONE)   This, I guess -- does this tell you

16   what the OSS sales were?

17   A.   For the last 6 months of the year, yes.

18   Q.   Okay.   Could you just kind of -- that would be this

19   number right here?   (Indicating).

20   A.   Yes.   The accumulation of those numbers.

21   Q.   Can you just give us that number quickly, just to

22   look at and tell us what that is for that 6-month period?

23   A.   It is a little bit more than a million 8.

24   Q.   Do you recall off the top of your head what the sales

25   for the first 6 months of 2010 were by OSN?

1   A.   I believe less than that in total.

2        MR. LEONE:  Okay.  And if I could, Your Honor,

3   publish Exhibit 52, which has been previously marked and

4   admitted.

5        THE COURT:  Any objection?

6        MR. LOPACH:  No objection, Your Honor.

7        THE COURT:  You may.

8   Q.   (BY MR. LEONE)  If you look at Exhibit 52 -- I am

9   beyond two questions aren't I?  If you look at Exhibit 52

10  that is now being displayed, does this help you recall

11  what the sales by OSN was in the first 6 months of 2010?

12  A.   A million 5.

13  Q.   Okay.  So if we combine all of sales from OSN and all

14  of the sales from OSS for all of 2010, that 2010 number

15  would be?

16  A.   About 3 million 3.

17  Q.   Okay.  Do you remember how that compared to what OSN

18  has alleged in this case was their quota for 2010?

19  A.   I think it was 4-and-a-half million.

20  Q.   Okay.  Does that analysis, that comparison, play any

21  role or relate in any way to your assumption that this

22  contract would not have continued beyond 2010?

23  A.   I think it emphasizes that you can slice and dice it

24  a couple different ways, and they weren't on track to meet

25  the quota that was stipulated on an annual basis.

1   Q.   Okay.  All right.  Now, this is my last question.

2   Mr. Lopach asked you what 10 times 500,00 would be.  Would

3   you do that in your profession if you were trying to come

4   up with a damage would that have any validity?

5   A.   No.  None whatsoever.

6          MR. LEONE:  Thank you very much.

7          No further questions.

8          THE COURT:  All right.  Thank you very much, sir,

9   you may step down.

10          (Further proceedings had but not transcribed per

11   request of ordering counsel.)

12          **R E P O R T E R ' S   C E R T I F I C A T E**

13          I, Darlene M. Martinez, Official Certified

14   shorthand Reporter for the United States District Court,

15   District of Colorado, do hereby certify that the foregoing

16   is a true and accurate transcript of the proceedings had

17   as taken stenographically by me at the time and place

18   aforementioned.

19

20          Dated this 9th day of July, 2012.

21

22          _____

23          s/Darlene M. Martinez

24          RMR, CRR

25